CHICAGO & NORTH WESTERN RAILWAY COMPANY, Appellant, v. PUBLIC SERVICE COMMISSION, Respondent. [Three appeals.]

Nos. 268–270. Argued June 2, 1969.—Decided July 3, 1969.
(Also reported in 169 N. W. 2d 65.)

For the appellant there was a brief by *Wickham, Borgelt, Skogstad & Powell,* attorneys, and *Roger S. Bessey, Robert M. Keating,* and *Paul J. Kraemer* of counsel, all of Milwaukee, and oral argument by *Mr. Bessey* and *Mr. Kraemer.*

For the respondent the cause was argued by *Clarence B. Sorensen,* attorney, with whom on the brief were *Robert W. Warren,* attorney general, and *William E. Torkelson,* chief counsel.

CONNOR T. HANSEN, J. The appeals present a question of: (1) The unconstitutional delegation of legislative authority to the Public Service Commission, and (2) the validity of the findings and orders of the Public Service Commission.

Sec. 195.06, Stats., provides that all orders of the Public Service Commission shall be prima facie lawful until finally found otherwise upon judicial review pursuant to ch. 227. The objections raised by the appellant must be tested by sec. 227.20 (1) (a), (b), (d) and (e). Sec. 227.20 provides that the decision of the agency may be reversed or modified by the circuit court:

"**Scope of review** . . . if the substantial rights of the appellant have been prejudiced as a result of the administrative findings, inferences, conclusions, or decisions being:

"(a) Contrary to constitutional rights or privileges; or

"(b) In excess of the statutory authority or jurisdiction of the agency, or affected by other error of law; or

". . .

"(d) Unsupported by substantial evidence in view of the entire record as submitted; or

"(e) Arbitrary or capricious."

The scope of review of this court is identical to that given to the circuit court by sec. 227.20, Stats. *See Scharping v. Johnson* (1966), 32 Wis. 2d 383, 389, 145 N. W. 2d 691.

## I.

*Constitutionality and excess of statutory authority.*

The commission's authority to apportion the costs of maintenance of the new structures is pursuant to secs. 84.05 and 195.29 (2), Stats.[1] However, no specific standard or formula for apportioning the costs between the public and the railroad is set forth in the statute.

The appellant contends that the authority granted the Public Service Commission to apportion the cost of maintenance of the railroad-highway underpasses must be construed as limited by a standard of apportionment ac-

[1] "84.05 **Railroad crossing improvements.** . . . If the commission is unable to contract with the persons concerned as to the distribution and payment of the cost of the work or the maintenance thereof, the commission shall lay the matter before the public service commission, and the public service commission shall review the proceedings and hold a hearing thereon in accordance with ss. 195.28 and 195.29, and shall fix the portion of the cost of the construction and of the maintenance which is to be paid by the persons or corporations concerned, and the portion of the cost, if any, to be paid by the public, which portion shall be paid from the highway construction fund. The public service commission shall determine the benefits, if any, which will inure to other highways, and apportion and charge to the units of government responsible for the construction of such other highways a fair portion of the cost."

"195.29 **Railroad highway crossings.** . . .

"(2) APPORTIONMENT OF EXPENSE. The commission shall fix the proportion of the cost and expense of alterations, removals and new crossings, or any other work ordered, including the damages to any person whose land is taken, and the special damages which the owner of any land adjoining the public street or highway shall sustain by reason of a change in the grade of such street or highway, or by reason of the removal of obstructions to view at such crossings, to be paid or borne by the railroad companies and the municipalities in interest. In fixing such proportion, the commission may order such cost and expense so apportioned to be paid by the parties against which the apportionment shall be made."

cording to the benefits received. Otherwise, the appellant argues, secs. 84.05 and 195.29 (2), Stats., must be declared void as an unconstitutional delegation of legislative authority, because absent some limit on its discretion, the commission would be empowered to say what the law shall be, and not merely authorized to exercise discretion as to its execution.

In asking this court to restrict secs. 84.05 and 195.29 (2), Stats., to a benefits received standard, the appellant is asking this court to perform a legislative function. Examination of the history of the statutes in question and other statutes related to apportionment of costs to railroads, reveals that the legislature has not intended to restrict cost of future maintenance to a benefits received standard. This is made apparent by the fact that the legislature has adopted the "benefits received" standard for apportionment of costs in sec. 195.28 (apportioning cost of protecting grade crossings between railroads and the state) and in the last sentence of sec. 84.05 (commission to determine benefits inuring to units of government by construction of a grade separation).

A further indication of the legislature's awareness of a benefits received standard and its desire to not make it the sole basis for apportionment of costs is found in sec. 195.29 (5), Stats., and its predecessors. That provision relates to the cost of the elimination of grade crossings as opposed to sec. 195.29 (2), which provides for apportionment of expenses. Sec. 1315 (3), Stats. 1917, a predecessor of sec. 84.05, deemed that the costs of elimination of a grade crossing were to be determined by sec. 1797–12 and 1797–12e. Sec. 1797–12e (5), Stats. 1919, a predecessor of sec. 195.29 (5), authorized the railroad commission to order a railroad to pay toward the cost of elimination of grade crossings "such sum of money as the commission shall find to be reasonably equivalent to the *benefits received.*" (Emphasis added.) In 1923, the legislature struck out the benefits received

language and inserted the words, "an equitable portion of the cost of such highway relocation, improvement or new construction; . . ." *See* ch. 344 of the Laws of 1923, and *Chicago, M. & St. P. Ry. v. Railroad Comm.* (1925), 187 Wis. 364, 369, 371, 204 N. W. 606.

Thus, the legislature is well aware of the standard of benefits received as it has seen fit to adopt such language in some legislation relating to apportionment of costs to railroads, but has removed it from other. It is, therefore, apparent that the legislature has intended that the benefits received standard shall not be the sole criterion for apportioning costs pursuant to secs. 84.05 and 195.29 (2), Stats.

Moreover, several cases have established the principle that railroads have no constitutional right to an apportionment according to a benefits received standard. Though any assessment of the railroad must be reasonable, due process does not require that the benefits standard is the only reasonable standard. *Atchison, Topeka & S. F. Ry. v. Public Utilities Comm.* (1953), 346 U. S. 346, 74 Sup. Ct. 92, 98 L. Ed. 51; *Erie Railroad Co. v. Board of Public Utility Commissioners* (1921), 254 U. S. 394, 41 Sup. Ct. 169, 65 L. Ed. 322. *See also Chicago, M. & St. P. Ry. v. Railroad Comm., supra,* approving assessments to railroad companies pursuant to sec. 84.05, Stats., for the expense of relation of railroad lines and highways.

The question then becomes whether, absent an apportionment restricted to benefits received, secs. 84.05 and 195.29 (2), Stats., must be declared void as an unconstitutional delegation of legislative authority.

Analysis of this question must begin with the basic principles of constitutional law and statutory construction: (1) That the statute must be presumed to be valid and constitutional; and (2) if a statute is open to more than one reasonable construction, the construction which will accomplish the legislative purpose and avoid uncon-

stitutionality must be adopted. *In re City of Beloit* (1968), 37 Wis. 2d 637, 643, 155 N. W. 2d 633.

The subject of the delegation of legislative power to the judiciary and to administrative agencies was discussed recently in *Schmidt v. Local Affairs & Development Department* (1968), 39 Wis. 2d 46, 158 N. W. 2d 306. It was there pointed out that this court may take a more liberal attitude toward delegations of legislative power to an administrative agency or administrative director, than where the delegation is to the judiciary. This is because "the legislative agency or director is, in fact, an arm or agent of the legislature itself. The very existence of the administrative agency or director is dependent upon the will of the legislature; its or his powers, duties and scope of authority are fixed and circumscribed by the legislature and subject to legislative change. . . . An administrative agency is subject to more rigid control by the legislature and judicial review of its legislative authority and the manner in which that authority is exercised." *Schmidt, supra,* at 56, 57.

This court in *Schmidt* also determined that the availability of safeguards was an entirely appropriate consideration and quoted the following language from *State ex rel. Wisconsin Inspection Bureau v. Whitman* (1928), 196 Wis. 472, 507, 508, 220 N. W. 929:

" 'As was pointed out by Mr. Dicey, there will remain two checks upon the abuse of power by administrative agencies. In the first place, every such agency must conform precisely to the statute which grants the power; secondly, such delegated powers must be exercised in a spirit of judicial fairness and equity and not oppressively and unreasonably.

" 'The doors of the courts of this country will always stand open to any citizen complaining that he has been deprived of his constitutional rights, no matter under what form of law the deprivation has been worked. The emergence of administrative agencies will not impair or destroy the checks and balances of the constitution. To these two may be added a third check—one which seems

to us is frequently overlooked,—and that is that all of these administrative agencies are the creatures of the legislature and are responsible to it. Consequently the legislature may withdraw powers which have been granted, prescribe the procedure through which granted powers are to be exercised, and if necessary wipe out the agency entirely.' " *Schmidt v. Local Affairs & Development Department, supra,* p. 57.

In fact, Professor Davis in discussing the doctrine of delegation to administrative agencies, concludes that the presence or absence of procedural safeguards should be the test of valid delegations. *See* 1 Davis, *Administrative Law Treatise,* p. 113, sec. 2.09; *Schmidt, supra,* p. 58.

It was also pointed out in *Schmidt* that in both the state and federal government the trend has been liberalizing as to what will be considered an unconstitutional delegation of power. This is the result of recognition that government cannot efficiently operate without the administrator and administrative agency. ". . . Wisconsin is in the forefront when it comes to recognition of the true nature of the delegation, or nondelegation, doctrine. Even as early as 1928, Mr. Justice ROSENBERRY, in *State ex rel. Wisconsin Inspection Bureau v. Whitman, supra,* recognized that what was being accomplished by administrative agencies was legislative-lawmaking. . . ."

"The test set forth by Mr. Justice ROSENBERRY follows: " 'The power to declare whether or not there shall be a law; to determine the general purpose or policy to be achieved by the law; to fix the limits within which the law shall operate,—is a power which is vested by our constitutions in the legislature and may not be delegated. When, however, the legislature has laid down these fundamentals of a law, it may delegate to administrative agencies the authority to exercise such legislative power as is necessary to carry into effect the general legislative purpose, in the language of Chief Justice MARSHALL, "to fill up the details"; in the language of Chief Justice TAFT, "to make public regulations interpreting the statute and directing the details of its execution." *State ex*

*rel. Wisconsin Inspection Bureau v. Whitman, supra,* pages 505, 506.' " *Schmidt, supra,* pages 58, 59.

It is the determination of this court that secs. 84.05 and 195.29 (2), Stats., do not involve an improper delegation of legislative power to the Public Service Commission. Appellant argues that the manner of apportionment is a legislative function which cannot be delegated. The appellant contends that when the Public Service Commission is given complete discretion to determine the apportionment it is empowered to say what the law will be, and such action is an unconstitutional delegation of legislative authority.

In the present matter the legislature has declared what the law shall be. It has determined that in the interest of public safety and for convenience of public travel certain railroad crossing improvements should be made. Having laid down the fundamentals, the legislature has delegated to the Public Service Commission the authority to exercise such legislative power as is necessary to carry into effect the general legislative purpose. Thus, if the parties in interest cannot reach an agreement either may petition the commission for a hearing, whereupon the commission is to determine what, if anything, shall be done to promote the public safety and the means by which it shall be accomplished. The commission is to further "fill up the details" by fixing "the portion of the cost of the construction and of the maintenance which is to be paid by the persons or corporations concerned, and the portion of the cost, if any, to be paid by the public." *See* sec. 84.05, Stats.

The legislature has not prescribed a percentage to be apportioned nor has it specified any particular standard for apportionment. However, "The rule of reasonableness inheres in every law, and the action of those charged with its enforcement must in the nature of things be subject to the test of reasonableness." *Whitman, supra,* at 509.

With the rule of reasonableness as a standard, the extent of benefits received by the respective parties, will be taken into consideration in the ultimate apportionment. It is generally unreasonable for a man to pay for something from which he receives no benefit. The difference between the two standards is that the test of reasonableness is not solely restricted to benefits received. Other considerations may come into play such as public safety, prior dealings, and the extent of the burden.

Moreover, due regard must be paid to the nature of the subject matter with which the act deals. If the legislature prescribed fixed percentages of apportionment the desired flexibility of the Public Service Commission would be dissolved. While the determination of apportionment may not be as complex as some administrative functions, it is of a type which is not conducive to fixed formulas and set guidelines. Even if a benefits received standard was the sole criterion, the commission would still be in a position of having wide discretion in reducing the benefits to dollars and cents.

The better approach is to permit the commission to make a reasonable apportionment based upon all the circumstances of the particular case. The legislature has declared what the law is to be and has prescribed procedures for carrying it out. The commission must act within the bounds of reason and not oppressively. In the final analysis, the safeguards of legislative control and judicial review effectively control the exercise of the commission's discretion.

## II.

*Arbitrary or capricious and substantial evidence.*

Having determined that secs. 84.05 and 195.29 (2), Stats., do not authorize an improper delegation of legislative power, the question remains whether the 100 per-

cent apportionment of future maintenance expenses to the appellant is arbitrary and capricious, and, if not, whether the findings and orders of the commission are supported by substantial evidence.

The rule as to whether the action of the commission can be said to be arbitrary is set forth in *Scharping v. Johnson, supra,* p. 390:

" 'It is, in general, the most flagrant violations of the scope of delegated discretionary powers which are described as capricious. In common usage, the term refers to a whimsical, unreasoning departure from established norms or standards; it describes action which is mercurial, unstable, inconstant, or fickle. In legal usage, a decision is capricious if it is so unreasonable as to "shock the sense of justice and indicate lack of fair and careful consideration."

" 'Typical of the cases in which the epithet *capricious* may properly be applied are those where an agency has given different treatment to two respondents in identical circumstances, or has exhibited an irrational unfairness which suggests malice or discrimination.' 2 Cooper, State Administrative Law (1965), p. 761.

"This court has stated:

" 'Arbitrary or capricious action . . . occurs when it can be said that such action is unreasonable or does not have a rational basis. . . . Arbitrary action is the result of an unconsidered, wilful and irrational choice of conduct and not the result of the "winnowing and sifting" process.' *Olson v. Rothwell* (1965), 28 Wis. (2d) 233, 239, 137 N. W. (2d) 86."

There is no indication that the commission has departed from "established norms or standards." Nor is there any showing that the commission has given different treatment to two respondents in identical circumstances. The commission in two of the three orders apportioning cost of maintenance, indicated that for twenty years separation projects of highway-railroad crossings of the highway commission have been constructed without cost to the railroad except for some cases in which the 10 percent assessment of benefits un-

der "Policy and Procedure Memorandum 21-10" of the Bureau of Public Roads was made against the railroad. Also, during this era, the agreements between the highway commission and railroads provided that the maintenance of structures carrying railroad traffic be maintained by the railroad.

A more significant question is whether the commission's action is unreasonable or does not have a rational basis.

The commission's rationale, as appears in its orders apportioning cost of maintenance, is that since the construction costs for the structures are at the sole expense of the highway commission, "it is reasonable and just that maintenance and the cost thereof should be apportioned to the railroad company." A further justification for maintenance of the Brown county structure is that the construction of a new structure will relieve the railroad of the burden of maintaining a structure over fifty years old, as well as its possible replacement in the foreseeable future.

The normal maintenance requirements for the three structures is painting every fifteen years and some patching of concrete due to salt on the highways in the winter which accelerates deterioration. If that were all the maintenance required it would be relatively easy to conclude that the apportionment was reasonable, and we would arrive at the same conclusion as did the trial court. It is obvious that if the tracks were not present the structures would not be required. The underpasses eliminate potential collisions with motor vehicles, eliminate the need for crossing warning signals, and make it possible for trains to run at constant speed. In addition, the Sheboygan county structure eliminates an existing grade crossing. The Brown county structure will relieve the railroad of maintaining the aging structure and possibly replacing it in the near future. As to the Appleton avenue structure, the railroad already has an agreement with the state to maintain the existing struc-

ture built there in 1934. *See Chicago, M. & St. P. Ry. v. Railroad Comm., supra,* at 372, 373, which indicates that as to elimination of a grade crossing the railroads derive obvious benefits.

However, the reasonableness of the commission's orders becomes subject to examination when it is taken into consideration that the railroad may have to replace the new structures at some time in the future. This probability apparently was not presented to the trial court. Thus, the appellant contends, should an act of God destroy or damage a structure or should a structure receive damage from a vehicle running into it, the railroad would be responsible for the repair or replacement. Furthermore, as the commission has not defined its concept of maintenance as to these cases, ultimately the proposed structures will have to be replaced and the burden of doing so will be upon the railroad. During the oral argument, the commission conceded that the railroad would have such responsibilities.

In *State ex rel. Boddenhagen v. Chicago, M. & St. P. Ry.* (1916), 164 Wis. 304, 308, 159 N. W. 919, in construing an old statute requiring the railroad company to build and maintain a highway overpass, this court defined maintenance as follows:

". . . Whether the viaduct was wrongfully broken down by a person who ran a steam shovel over it or not is immaterial so far as the duty of the railway company to maintain the viaduct is concerned. The railway company assumed the obligation to erect and maintain the viaduct. The word 'maintain' has a well defined meaning and includes keeping up, preserving, and rebuilding in case of destruction."

This language was cited with approval in *Janesville v. Chicago & N. W. Ry.* (1951), 258 Wis. 547, 555, 46 N. W. 2d 847, where it was determined that the railroad company had a statutory duty to restore its bridge after it burned down even though it burned through no fault

of the railroad company. *See also* 37 Op. Atty. Gen. (1948), 243, 245, which cites *State ex rel. Boddenhagen, supra,* for the proposition that "Under some circumstances it [maintenance] would even be deemed to include rebuilding where an existing structure is destroyed."

Thus, the appellant is faced with the very real possibility that it might have to rebuild each of these structures at a cost equal to or exceeding the basic cost now paid by the state.

The question is what is just and reasonable. The state bears the entire cost of the original construction. However, the fact that the railroad does not pay anything for the cost of construction is due to the fact that the division of the cost of construction must be in accordance with the policy and procedure of the Bureau of Public Roads, United States Department of Commerce Memorandums 21-10 and 30-3, in order for the state to receive federal funds.

The commission orders indicate that the cost of construction for each of the three structures was in accordance with Memorandums 21-10 and 30-3. Paragraph 5 (2) of Memorandum 21-10 states that reconstruction of existing railway-highway grade separation structures "shall be considered as not resulting in ascertainable benefits to the railroad and consequently the railroad shall not be assigned liability as to the cost thereof." In some other projects for the elimination of hazards of railway-highway crossings, the railroad may be subject to liability of 10 percent of the cost of construction. As to responsibilities for future maintenance, paragraph 22 of Memorandum 21-10 merely states that such shall be determined by negotiation between the state highway department and the railway.

Under the facts of these cases, it is inherently unjust and unreasonable to subject the appellant to the contingency of repairing or replacing the structures in the

event of a disaster, deterioration or serious accident. Such responsibilities should be fairly apportioned between the state and the appellant.

Furthermore, the record indicates that since the early 1960's wording of the agreements between the highway commission and the railroads as to maintenance of highway underpasses was changed to provide that the railroad company shall not be prohibited from obtaining maintenance assistance should subsequent state policy provide for such relief or otherwise permit other public agencies to assume a part of or all obligation for maintenance.

While the railroad derives some benefits from the construction of the new structures and has an obligation to share in the cost of promoting the public safety and the convenience of travel, it is not reasonable that it should be a 100 percent insurer of the future of the new structures. There is not substantial evidence to justify such an allocation and we are of the opinion that the commission's orders are inherently unjust and unreasonable.

Therefore, these cases are remanded to the Public Service Commission for further proceedings consistent with this opinion.

*By the Court.*—Judgments reversed, and causes remanded for further proceedings.